UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| NATHAN CANNON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:16-CV-156 |
| | ) |
| THE CITY OF SOUTH BEND, INDIANA, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Sergeant Nathan Cannon of the South Bend Police Department filed this action against the City of South Bend under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 *et seq.*, for employment discrimination and retaliation. The City has moved for summary judgment. [DE 36] For the reasons stated herein, the Court will grant the motion.

## STANDARD

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court

must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

## FACTUAL BACKGROUND

Sergeant Nathan Cannon has been an officer with the South Bend Police Department since 1984. He started off as a patrolman, moved up in rank to corporal, and then received a promotion to sergeant in or around 1994. Five years later, he received a transfer from the uniformed patrol division to the detective bureau, and he has served in that unit ever since. Cannon is African-American.

Sherri Taylor served as a lieutenant on the detective bureau's day shift.[1] When she decided to retire, the department notified all its lieutenants and sergeants in February 2014 that it would be accepting applications for the position of lieutenant on the detective bureau's day shift. Cannon then made two assumptions. First, he anticipated that the department would select only one individual for the position of lieutenant on the day shift, given that the job posting came on the heels of only one person's departure (Taylor's). Second, Cannon knew that another lieutenant on the detective bureau's afternoon shift, Marcus Wright, also African-American, put in for a lateral transfer from the afternoon to the day shift, and Cannon believed that Wright would automatically receive the transfer. In short, Cannon assumed that the department sought to fill only one lieutenant position on the day shift, and that it would fill that slot with Wright, so Cannon did not submit an application in response to the February 2014 job posting. Instead, he kept his eye on Wright's position as lieutenant on the afternoon shift, which he supposed would

---

[1] The detective bureau has three shifts: day; afternoon; and midnight.

be vacated upon Wright's hoped-for transfer. In Cannon's own words, the afternoon lieutenant shift was the *only* position that interested him. [Cannon Dep. 69:22-23; 73:5-6; 74:12-14]

Unfortunately for Cannon, he was mistaken in his assumptions. Nothing about the February 2014 job posting stated that the department would limit itself to selecting only one lieutenant for the day shift from the pool of applications received.[2] Indeed, Chief Scott Ruszkowski attested that the posting did not specify the number of available positions in order to allow the department "flexibility to decide how many officers to promote based on the size and quality of the applicant pool, changing workflow demands, available funding, and other issues that may be subject to change between the time of the posting and the time [the department is] ready to make promotions." [Ruszkowski Aff. ¶¶ 5-6] According to Ruszkowski, several other promotions within the department have been handled similarly over the past four or five years. *Id.* ¶ 6. Furthermore, apart from Cannon's own impression, nothing supported his belief that Wright would automatically receive a lateral transfer. In fact, former chief Daryl Boykins testified that the department rarely allowed such transfers without requiring individuals to go through the same competitive process as all other applicants:

> Q: Let me ask you, generally speaking, was it the practice of the police department to let people who already held the rank transfer from one shift to another before opening --
> A: Not often. If it happened, it was just very, very few times I remember. Usually always posted everything.

[Boykin Dep. 15:18-24] Chief Ruszkowski also confirmed that rank does not guarantee a requested shift transfer:

> Q: [C]an you think of anyone, any officer who was denied a lateral transfer because someone else was promoted to the position that they were applying to transfer to?

---

[2] Cannon even acknowledged that he could have misinterpreted the job posting as only referring to one position, and that he could have applied regardless. [Cannon Dep. 55:2-22; 60:25-61:3; 67:12-20]

3

> A: I can't but when you say "denied," it would be, again, through the process, the interview process and everything else that that would entail, would be the deciding factor whether that person got to go to a different shift or not. It's not necessarily based on because of seniority or tenure that you would get that position.

[Ruszkowski Dep. 36:9-19]

Ultimately, Wright did not receive his requested transfer to the day shift, and the department promoted three sergeants (all of them Caucasian) to the rank of lieutenant following an open interview process: Amy Bennett; Dominic Zultanski; and Anthony Bontrager. All three of these individuals had submitted applications in response to the February 2014 job posting, and the department assigned all three of them to the detective bureau's day shift. The department further assigned Zultanski to lead the newly created Group Violence Initiative ("GVI") program, although the job posting made no mention of this position. As for Bennett, she became Cannon's immediate supervisor. Cannon filed an EEOC complaint on June 30, 2014, alleging that the department denied him access to a promotion based on his race.[3] This lawsuit followed.

## DISCUSSION

Sergeant Cannon brings two claims under Title VII. First, he alleges that the City discriminated against him when it promoted Zultanski – "a lesser qualified Caucasian officer" – to the rank of lieutenant and placed Zultanski in charge of the GVI program. [DE 39 at 6] The City never announced an opening for this new position, and because Cannon believes he is better qualified for the role, he infers that the City barred him from applying because of his race. Second, Cannon alleges that when Bennet became his supervisor, she subjected him to undeserved scrutiny and undermined his 2016 application for supervisory sergeant in retaliation

---

[3] Cannon amended his EEOC complaint on July 21, 2014, to reflect the number of sergeants promoted to lieutenant in relation to the February 2014 job posting. [DE 37-1 at 33]

4

for filing an EEOC complaint against the department, a protected activity. Because the record contains no evidence of racial discrimination in the promotion process, and because the record likewise fails to show that Bennett even knew Cannon engaged in a protected activity, the Court will grant summary judgment on both of Cannon's claims.

**A.      Discrimination**

Cannon maintains that the City directly discriminated against him by promoting Dominic Zultanski from sergeant to lieutenant and by placing Zultanski at the head of the newly created GVI program.[4] Because Cannon believes that he had stronger qualifications than Zultanski, he infers that the department refrained from promoting him based on his race. "Failure to promote can be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (citations omitted). In general, to establish a prima facie Title VII case in the failure-to-promote context, Cannon "must show that 1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001)).

To prevail on his discrimination claim, Cannon must demonstrate a causal link between his race and an adverse action. The legal standard to be applied "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion,

---

[4] Cannon's opposition brief also alleges that the City discriminated against him by denying his application for a supervisory sergeant position in 2016. [DE 39 at 8-9] However, this alleged conduct occurred long after he filed his EEOC complaint and does not fall within the scope of the charge contained therein. Therefore, he cannot just now pursue this discrimination theory as a new count. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996) ("A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if her allegations fall within the scope of the charges contained in the EEOC complaint.").

5

or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id*. That evidence may include circumstantial evidence, which "can take on many forms, and includes 'evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Everett*, 655 F.3d at 729 (quoting *Sun v. Bd. of Trs.*, 473 F.3d 799, 812 (7th Cir. 2007)). But "[w]hatever circumstantial evidence is offered must, in the end, 'point directly to a discriminatory reason for the employer's action." *Id*. (citing *Adams v. Wal-Mart Stores, Inc*., 324 F.3d 935, 939 (7th Cir. 2003)).

It is undisputed that Cannon did not apply for a promotion to lieutenant in February 2014, nor did he apply for the GVI program's leader position. In fact, he has never applied for any lieutenant position within the police department. [DE 37-4] The Seventh Circuit has repeatedly held that a plaintiff cannot make out a prima facie case of Title VII discrimination for failure to promote where he has not applied for the job at issue. *See, e.g.*, *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) (holding that failure-to-promote claim requires that plaintiff "appl[y] for … the position sought" and granting summary judgment on Title VII claim where plaintiff did not apply for higher position) (quotation marks and citations omitted). However, that requirement may be relaxed "where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting." *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994); *see also Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 558 (7th Cir.

2008) ("If a plaintiff does not apply for a job vacancy that is posted, he cannot make a prima facie case for unlawful discrimination or retaliation under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying.").

Cannon attempts to invoke this exception by arguing that the City prevented him from applying for promotion and advancement when it made no disclosure that the City was looking to appoint someone to lead the GVI program in February 2014. According to Cannon, the City subjected him to racial discrimination by not opening the position to a competitive application process, and instead "simply promoted a non-minority officer who held inferior qualifications in comparison to [Cannon]." [DE 39 at 8] The record, however, does not bear that out.

In order to excuse his failure to apply, as noted above and discussed in *Loyd* and *Hudson*, Cannon must present evidence that the City structured the promotion process in such a way as to exclude his candidacy for the GVI leadership role (or for a promotion to lieutenant) *because of his race*. Based on the filings, no such evidence exists; in fact, the City never excluded Cannon from the application process at all. The City posted an opening for the position of lieutenant on the detective bureau's day shift and emailed it to all sergeants and lieutenants – African-Americans and Caucasians alike. The language of the notice did not foreclose the City from promoting more than one applicant should the circumstances permit, and everyone who read that posting, including Cannon, had the same opportunity to apply. The City decided to promote three sergeants to the rank of lieutenant and assigned them to the detective bureau's day shift. All three of them submitted applications in response to the February 2014 notice, including Zultanski, who received the additional role of leading the GVI program.

Cannon acknowledges that he received the job posting, but nonetheless did not apply because he only wanted the lieutenant's position on the afternoon shift, which he assumed would

7

become available upon Wright's prospective transfer. Nothing in the record suggests that, had Cannon actually applied in response to the February 2014 day shift lieutenant job posting, he would not have been likewise considered for the GVI leadership position, or that he would not have been awarded that job over Zultanski. But regardless, even though the February 2014 posting did not reference the new GVI position, Cannon has presented no evidence that the City intentionally omitted said reference or otherwise concealed that opportunity in an effort to exclude Cannon (or other African-Americans) from the position. And while Cannon attempts to reinforce his discrimination claim by citing a pattern and practice of unequal departmental opportunities for African-Americans through former chief Daryl Boykins's general statements, none of Boykins's testimony suggests a historical practice of manipulating job postings to exclude African-Americans from applying for promotion. Thus, Boykins's testimony would not allow a reasonable jury to infer that the City tried to do the same regarding the new GVI position. As in *Hudson*, Cannon fails to point out any facts that suggest the City structured the promotion process "to keep him from applying." 375 F.3d at 558.[5] Therefore, because he has presented no evidence of racially motivated discrimination in the instant promotion process (or even in previous promotion processes), Cannon's discrimination claim cannot overcome the fact that he did not apply for the very position he now complains about. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 n.2 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1328, 197 L. Ed. 2d 517

---

[5] Cannon's lack of evidence of specific discrimination against him further undermines his attempt to raise a "pattern or practice" of departmental discrimination. *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829-30 (7th Cir. 2014) ("As an individual rather than a class action, we have held that evidence of a pattern or practice *can only be collateral to evidence of specific discrimination against the plaintiff herself*....") (citation omitted and emphasis added). "Moreover, to proceed with such a claim, [Cannon] would need to present evidence indicating that racial discrimination was the employer's standard operating procedure—the regular rather than unusual practice." *Id.* (citing *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 336, (1977); *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 422 (7th Cir. 2000)).

8

(2017) (application requirement not excused absent any evidence that employer engaged in surreptitious behavior to preclude plaintiff from applying).

"The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him *because of his race*." *Morgan*, 724 F.3d at 997 (emphasis added). In this case, Cannon has presented no evidence that race played any part in the decision to fill a new, unposted position from the pool of those who applied for lieutenant on the detective bureau's day shift in February 2014. However unwise or unfair the City's promotion process may have seemed to Cannon, this Court does not function as a "super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). The Court will therefore grant summary judgment for the City on Cannon's discrimination claim because the record here does not excuse his failure to apply for the position sought. *Riley*, 829 F.3d at 892 ("Summary judgment for the employer is appropriate if the employee fails to establish any of the elements of a prima facie case for failure to promote.").

**B.    Retaliation**

Cannon's second Title VII claim is for retaliation. Cannon maintains that, when Amy Bennett received a promotion to Lieutenant and became his direct supervisor, she subjected his case reports to unfair and unwarranted scrutiny in retaliation for his EEOC complaint. As the City notes, her criticism of his work did not impact his rank or pay, and did not result in any disciplinary action or review from the office of professional standards. But Cannon further suggests that Bennett additionally retaliated against him by informing the human resources

9

department that he would not be a good fit for the position of supervisory sergeant, for which he unsuccessfully applied in 2016.[6]

To make out a claim for retaliation under Title VII, Cannon must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). The parties do not dispute that Cannon engaged in a protected activity by filing his EEOC complaint. They do contest whether Bennett subjected Cannon to an adverse employment action, but whether Cannon can demonstrate the second element of retaliation matters little in light of the lack of evidence to support the third. "[T]he protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (quoting *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013)). "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Id.*

Here, Cannon has presented no evidence of a causal link between his EEOC filing (or his filing of the instant lawsuit) and Bennett's allegedly adverse conduct. In fact, Cannon himself made clear at his deposition, rather insistently, that he had no reason to believe that Bennett singled him out, harassed, or ridiculed him for any retaliatory reason whatsoever:

---

[6] Cannon also mentions an "extremely hostile work environment" in his opposition brief [DE 39 at 3-4], but offers neither evidence nor argument to support that theory. *See, e.g.*, *Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018) ("To prove a retaliatory hostile work environment, Flanagan must show that (1) her work environment was both objectively and subjectively offensive; (2) the harassment was in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability.").

> Q: But as you sit here today, is it still your claim that [Bennett] was singling you out for intimidation and harassment and ridicule?
> A: I felt that, yes.
> Q: And you felt that the reason why she was doing that was because you had complained to the EEOC like we see here in Exhibit 1?
> A: *That was not made clear, so I can't say if that's why she was doing that. I can't answer that. Only she can answer that.*
> Q: Well, I mean I understand you don't know what's going on inside her head, but do you believe that that's why she was doing it?
> A: *Because of the lawsuit? She never made that clear to me, so I really can't say in all honesty.*
> …
> A: *She never did come out and say what her intent was.*
> Q: If you had to make your best assessment of what her intent was, do you think it had something to do with you complaining of discrimination?
> A: *In all honesty, I can't say.*
> …
> A: *I can't say that she was retaliating because of the lawsuit.*
> Q: Okay.
> A: *I can't -- I can't say that she was doing that because of the lawsuit. Okay? I never asked her why she was treating me the way she did.*

[Cannon Dep. 37:10-38:22 (emphasis added)] Nothing else in the record supports the notion that Bennett even knew Cannon filed an EEOC complaint in the first place, let alone that Cannon's protected activity made up the but-for cause of Bennett's allegedly retaliatory conduct. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) ("Suspicious timing by itself will rarely support an inference of retaliation" unless "the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.").

Nor does the record contain any evidence (and Cannon cites none) to support the theory at the end of Cannon's opposition brief, that somehow the City subjected him to retaliatory adverse employment actions by placing Bennett as his supervisor and then letting her "harass and bully him in a manner that he had never experienced in his previous 30 years as an employee." [DE 39 at 12] Again, "timing alone does not permit an inference of retaliation where, as here, [Cannon] has no other admissible evidence of pretext." *Brown v. Bd. of Trustees of The Univ. of*

11

*Ill.*, 673 Fed. App'x 550, 554 (7th Cir. 2016). Thus, Cannon cannot base his retaliation claim simply on his observation that, after his EEOC filing, his new supervisor held him to a higher standard than he had experienced in his previous years on the force. No genuine issue of material fact exists as to the critical element of causation, and so the Court will grant summary judgment in favor of the City on Cannon's retaliation claim.

## CONCLUSION

The Court is mindful and appreciative of Sergeant Cannon's years of service to the City of South Bend and its police department. However, Cannon has not presented the Court with any evidence that would create a genuine issue of material fact as to whether the City prevented him from applying for a promotion or for the GVI role because of his race. Nor does the record contain any evidence that his protected activities made up the but-for cause of Bennett's alleged retaliatory conduct. Therefore, the Court **GRANTS** the City's motion for summary judgment. [DE 36] The Clerk is hereby **DIRECTED** to enter judgment.

SO ORDERED.

ENTERED: August 20, 2018

        /s/ JON E. DEGUILIO
Judge
United States District Court